UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

FRANK HIGIRO,
Petitioner,

v.

MICHAEL NESSINGER; DAVID T. WESLING; DAVID VENTURELLA; MARKWAYNE MULLIN; and TODD BLANCHE,
Respondents.

No. 26-cv-450-JJM-PAS

**MEMORANDUM AND ORDER**

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Pending before the Court is Frank Higiro's Second Habeas Petition. ECF No. 1. Mr. Higiro is a noncitizen who has been detained by Immigration and Customs Enforcement ("ICE") at the Donald W. Wyatt Detention Facility ("the Wyatt") for more than eighteen months. After finding his first bond hearing to be constitutionally deficient, this Court granted Mr. Higiro's First Habeas Petition and ordered the Government to provide him with a second bond hearing. *See Higiro v. Nessinger* ("*Higiro I*"), No. 26-cv-105-JJM-AEM, 2026 WL 710297, at *8 (D.R.I. Mar. 13, 2026). That second request for bond was denied, and the Court denied Mr. Higiro's subsequent motion to enforce. *See Higiro v. Nessinger* ("*Higiro II*"), No. 26-cv-105-JJM-AEM, 2026 WL 1329522, at *7 (D.R.I. May 13, 2026).

Mr. Higiro now returns to this Court with a host of new claims, alleging: (1) that his more than eighteen-month detention has become unreasonably prolonged;

(2) that his attorney at his second bond hearing provided him with ineffective assistance of counsel; and (3) that Wyatt personnel have provided him with inadequate medical and psychiatric treatment while in detention. *Id.* The Government argues that Mr. Higiro has failed to satisfy his burden for each of the claims presented. ECF No. 4.

For the reasons stated below, the Court agrees with the Government. As such, the Court DENIES Mr. Higiro's Second Habeas Petition.

## I. BACKGROUND

As mentioned, this is the Court's third encounter with Mr. Higiro. The Court assumes the parties' familiarity with the facts.

However, to briefly recount, Mr. Higiro is a citizen of Rwanda who came to the United States on a student visa in 2015. *Higiro I*, 2026 WL 710297, at *1. Since 2023, Mr. Higiro has had three encounters with law enforcement: (1) he was arrested in Maine for the charge of operating under the influence ("OUI"), but that charge was dismissed; (2) he was arrested in New Hampshire and charged with the offense of prohibited sales of alcohol to a minor, but that charge was also dismissed; and (3) he was arrested in Maine again and charged with assault, criminal restraint, and furnishing liquor to a minor, but this case was later closed after police officers were unable to reach the alleged victim. *See id.* at 1-2.

On February 20, 2025, ICE officers arrested and detained Mr. Higiro and charged him with having failed to maintain the terms or conditions of his student

visa. *Id.* at 2. Since then, he has remained in detention at the Wyatt for more than eighteen months. *Id.*

During that time, Mr. Higiro has received two bond hearings before an immigration judge ("IJ"). The first occurred on March 13, 2025, at which IJ Natalie Smith found Mr. Higiro to pose a danger to the community and denied bond. *Id.* Mr. Higiro appealed this decision to the Board of Immigration Appeals ("BIA"), but the BIA later affirmed IJ Smith's bond determination. *Id.*

About a year later, Mr. Higiro filed a habeas petition with this Court and argued, among other things, that IJ Smith's bond decision was "legally insufficient" because she failed to consider alternatives to detention before denying his request for release on bond. *Id.* at 4. The Court agreed and ordered the Government to provide Mr. Higiro with a second bond hearing at which the IJ was to meaningfully consider alternatives to detention before making any determination as to bond. *Id.* at 7-8.

The second bond hearing occurred on March 19, 2026 before IJ Christine Olson. *Higiro II*, 2026 WL 1329522, at *1. IJ Olson concluded that Mr. Higiro was not a suitable candidate for any alternative to detention program, and she also reaffirmed IJ Smith's dangerousness determination and denied Mr. Higiro's second request for release on bond. *Id.* at 5-7. Mr. Higiro filed a motion to enforce judgment with this Court, alleging that his second bond hearing was also deficient, but the Court denied that motion. *Id.* at 7.

At the same time that Mr. Higiro was in detention proceedings, he was also in removal proceedings.[1] On May 21, 2025, IJ Smith denied Mr. Higiro's application for asylum and withholding of removal and ordered him removed to Rwanda. *Higiro I*, 2026 WL 710297, at *2. Mr. Higiro appealed that denial to the BIA, but the BIA dismissed his appeal on June 1, 2026. ECF No. 4 at 3-4.

Mr. Higiro thereafter petitioned the First Circuit for judicial review of his removal order, and he also moved to stay his removal proceedings. *See Higiro v. Blanche*, No. 26-1716, slip op. at 1 (1st Cir. June 15, 2026).[2] On June 15, 2026, the First Circuit entered a temporary administrative stay of Mr. Higiro's removal. *Id.* However, on June 30, 2025, the First Circuit denied Mr. Higiro's motion for a stay of removal pending the resolution of his petition for review, and it vacated the administrative stay. *See Higiro v. Blanche*, No. 26-1716, slip op. at 1 (1st Cir. June 30, 2026). Mr. Higiro moved for reconsideration, which the First Circuit also denied. *See Higiro v. Blanche*, No. 26-1716, slip op. at 1 (1st Cir. July 7, 2026).

On July 13, 2026, Mr. Higiro filed this Second Habeas Petition with this Court. ECF No. 1. He brings a variety of claims, including that: (1) his more than eighteen-month detention has become unreasonably prolonged; (2) his attorney at his second

---

[1] To be clear, challenges to detention and challenges to removal are distinct from one another. *See Aguilar v. U.S. Immigr. & Customs Enf't*, 510 F.3d 1, 12 (1st Cir. 2007) (citing *Hernandez v. Gonzales*, 424 F.3d 42, 42-43 (1st Cir. 2005)). That said, the two often go hand-in-hand because "[d]etention during removal proceedings is a constitutionally permissible part of that process." *Demore v. Kim*, 538 U.S. 510, 531 (2003).

[2] A court may take judicial notice of judicial decisions from other courts. *See Berríos-Romero v. Estado Libre Asociado de P.R.*, 641 F.3d 24, 27 (1st Cir. 2011).

bond hearing provided him with ineffective assistance of counsel; and (3) his medical and psychiatric treatment while at the Wyatt has been constitutionally deficient. *Id.* The Government opposes each claim. ECF No. 4.

## II. LEGAL STANDARD

28 U.S.C. § 2241 provides that federal courts may grant habeas relief to individuals who are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). "The burden of proof of showing deprivation of rights leading to unlawful detention is on the petitioner." *Espinoza v. Sabol*, 558 F.3d 83, 89 (1st Cir. 2009) (citing *Walker v. Johnston*, 312 U.S. 275, 286 (1941)).

## III. DISCUSSION

### A. Unreasonably Prolonged Detention Claim

Mr. Higiro first argues that his detention has become unreasonably prolonged. ECF No. 1 at 16-19. For context, the Supreme Court has held that the detention of a noncitizen who is subject to a final order of removal is "presumptively reasonable" for up to six months. *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001). After six months, a detained noncitizen may seek release by demonstrating that "there is no significant likelihood of removal in the reasonably foreseeable future," and then it is up to the Government to "respond with evidence sufficient to rebut that showing." *Id.*

Mr. Higiro's prolonged detention argument necessarily requires a look to the statute authorizing his current detention. When the Court considered Mr. Higiro's First Habeas Petition earlier this year, it found that his detention was governed by

Section 1226(a) because ICE was holding him during the pendency of his removal proceedings. *Higiro I*, 2026 WL 710297, at *3; *see Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018) (stating that Section 1226(a) "authorizes the Government to detain certain [noncitizens] already in the country pending the outcome of removal proceedings"). At the time, the Court explained that those proceedings were still ongoing because, even "though an IJ ha[d] ordered him removed to Rwanda . . ., this decision ha[d] not yet become a final order of removal because the BIA ha[d] yet to rule on Mr. Higiro's appeal of that decision." *Id.*

Since then, both parties agree that the basis for Mr. Higiro's detention has shifted to Section 1231(a), which governs the detention of noncitizens who have been "ordered removed" from the United States. *Johnson v. Arteaga-Martinez*, 596 U.S. 573, 575 (2022) (quoting 8 U.S.C. § 1231(a)); *see* ECF No. 1 at 12; ECF No. 4 at 2. The parties cite the BIA's dismissal of Mr. Higiro's appeal of the IJ's order of removal as the catalyst for this shift in detention authority. ECF No. 1 at 12; ECF No. 4 at 2. But that only tells half the story.

Importantly, Section 1231(a) provides that the Government "shall remove the [noncitizen] from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A). This 90-day period is referred to as the "removal period." *Arteaga-Martinez*, 596 U.S. at 578 (quoting 8 U.S.C. § 1231(a)(1)(A)). Noncitizens are subject to mandatory detention during this 90-day removal period. *Johnson v. Guzman Chavez*, 594 U.S. 523, 528 (2021) (citing 8 U.S.C. § 1231(a)(2)). Key to Mr. Higiro's

prolonged detention claim is when his removal period began and, by extension, when it will end.

Section 1231(a) states that the removal period begins on the "latest" of three dates:

> (i) The date the order of removal becomes administratively final.
>
> (ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the [noncitizen], the date of the court's final order.
>
> (iii) If the [noncitizen] is detained or confined (except under an immigration process), the date the [noncitizen] is released from detention or confinement.

8 U.S.C. § 1231(a)(1)(B).

As relevant here, Mr. Higiro's removal order became "administratively final" on June 1, 2026, which, again, is the date the BIA dismissed his appeal. ECF No. 1 at 12; *see* 8 C.F.R. § 1241.1(a) (explaining that "[a]n order of removal made by the [IJ] . . . shall become final . . . [u]pon dismissal of an appeal by the [BIA]"). In the ordinary course, this would have been the start of Mr. Higiro's 90-day removal period. The story does not end there, however.

Mr. Higiro thereafter sought judicial review of his removal order and, on June 15, 2026, the First Circuit administratively stayed his removal pursuant to First Circuit Local Rule 18.0.[3] *See Higiro v. Blanche*, No. 26-1716, slip op. at 1 (1st

---

[3] This local rule "provides a noncitizen who files a timely stay motion with a temporary automatic stay of removal that lasts for a period of ten business days." *Bezerra Da Silva v. Blanche*, No. 26-cv-360-JJM-PAS, 2026 WL 2322720, at *2 (D.R.I. Aug. 11, 2026) (citing 1st Cir. Loc. R. 18.0). "That stay can be extended if the court grants the underlying stay motion." *Id.* (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

Cir. June 15, 2026) ("Removal of [Mr. Higiro] is hereby stayed for ten business days from the date of this order."). Then, on June 30, 2026, after finding that he had "not made the required 'strong showing' that he [was] likely to succeed on the merits of his petition," the court denied Mr. Higiro's motion for a stay of removal pending the resolution of his petition for review, and it vacated its earlier administrative stay. *Higiro v. Blanche*, No. 26-1716, slip op. at 1 (1st Cir. June 30, 2026) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)). The First Circuit also denied Mr. Higiro's subsequent request for reconsideration. *Higiro v. Blanche*, No. 26-1716, slip op. at 1 (1st Cir. July 7, 2026).

This development changes the commencement of Mr. Higiro's 90-day removal period. "Courts have consistently held that temporary stays of removal automatically suspend § 1231 detention and the removal period, but that once the stay is vacated, § 1231 again governs and the removal period restarts." *D'Ambrosio v. McDonald*, 793 F. Supp. 3d 271, 277 (D. Mass. 2025) (citing *Payano v. Lowe*, No. 3:cv-16-2029, 2016 WL 6995433, at *2 (M.D. Pa. Nov. 30, 2016)); *see also Wilson v. Green*, No. 16-1906 (SDW), 2016 WL 4571389, at *2-3 (D.N.J. Sept. 1, 2016) (holding that a noncitizen's detention during temporary stay of removal was governed by Section 1226(c), but then shifted to Section 1231(a) when the Third Circuit vacated its temporary stay and denied the motion for stay of removal); *Samba v. Lowe*, No. 3:18-cv-0662, 2020 WL 599839, at *3 (M.D. Pa. Feb. 7, 2020) (holding that a noncitizen's removal period began "when the Third Circuit Court of Appeals denied his motion to stay and vacated its temporary stay of removal").

Here then, though Mr. Higiro's initial removal period began on June 1, 2026 upon the BIA's dismissal of his appeal, *see* 8 U.S.C. § 1231(a)(1)(B)(i), the removal period was suspended fourteen days later on June 15th, when the First Circuit issued its administrative stay of removal. This "temporarily revert[ed] the statutory basis for [Mr. Higiro's] detention to § 1226(a)." *D'Ambrosio*, 793 F. Supp. 3d at 278 (citing *Green*, 2016 WL 4571389, at *2-3); *see also Reid v. Donelan*, 64 F. Supp. 3d 271, 276-77 (D. Mass. 2014). Shortly thereafter, on June 30th, "[Mr. Higiro's] detention once again became subject to § 1231 when the First Circuit vacated the stay, thereby restarting the removal period." *D'Ambrosio*, 793 F. Supp. 3d at 278 (citing *Payano*, 2016 WL 6995433, at *1). This is so because, once again, the removal period begins on the *latest* of three dates, including, "if a court orders a stay of the removal of the [noncitizen], the date of the court's final order." 8 U.S.C. § 1231(a)(1)(B)(ii).[4]

Mr. Higiro's prolonged detention claim therefore fails because he is still within the 90-day removal period where his detention is mandatory. *See Guzman Chavez*, 594 U.S. at 528 (citing 8 U.S.C. § 1231(a)(2)). His period of mandatory detention under Section 1231(a) expires 90 days from June 30, 2026, which is on or about September 28, 2026. And under *Zadvydas*, Mr. Higiro's detention would remain "presumptively reasonable" for another 90 days after that. 533 U.S. at 701.

---

[4] That the First Circuit subsequently denied Mr. Higiro's motion for reconsideration of the stay order does not change this analysis. For the purposes of Section 1231(a), the Court's final disposition of the stay request came when it denied Mr. Higiro's stay motion and vacated its earlier administrative stay, not when it declined to reconsider its denial of the stay motion. *See* 8 U.S.C. § 1231(a)(1)(B)(ii).

Mr. Higiro argues that the Court's prolonged detention analysis must account for the more than eighteen total months he has spent in ICE custody since February 2025. ECF No. 1 at 12. In other words, he asks the Court to factor in *both* his detention under Section 1226(a) and under Section 1231(a). *Id.* Unfortunately, that is not how the analysis works. *Zadvydas* claims, like the one at issue here, deal with noncitizens "who were admitted to the United States but *subsequently ordered removed*." *Zadvydas*, 533 U.S. at 682 (emphasis added).[5] Thus, the length of time spent in detention following the commencement of the removal period is what matters—not the length of time spent in detention during the pendency of removal proceedings. Indeed, as the First Circuit has acknowledged, "[t]he exact length of detention under section 1226(a) is impossible to predict and can be quite lengthy[.]" *Hernandez-Lara v. Lyons*, 10 F.4th 19, 29 (1st Cir. 2021).

The Court must therefore DENY Mr. Higiro's prolonged detention claim, as it is premature. If Mr. Higiro remains detained beyond the presumptively reasonable six-month detention period contemplated by the *Zadvydas* Court, he may file a new habeas petition reasserting that claim.

[5] To be clear, *Zadvydas* claims can also be brought by noncitizens who have not been admitted into the United States (i.e., "inadmissible" noncitizens). *See Clark v. Martinez*, 543 U.S. 371, 387 (2005) ("Since the Government has suggested no reason why the period of time reasonably necessary to effect removal is longer for an inadmissible [noncitizen], the 6-month presumptive detention period we prescribed in *Zadvydas* applies.").

B. Ineffective Assistance of Counsel Claim

Mr. Higiro next claims that his attorney at his second bond hearing, ("his Attorney" or "CF"), provided him with ineffective assistance of counsel. ECF No. 1 at 19-23.

To begin, because immigration proceedings are civil—rather than criminal—in nature, noncitizens do not have a Sixth Amendment right to counsel. *See Lozada v. I.N.S.*, 857 F.2d 10, 13 (1st Cir. 1988). That said, immigration proceedings must still comport with the fundamental requirements of the Fifth Amendment's Due Process Clause. *See United States v. Castillo-Martinez*, 16 F.4th 906, 917 (1st Cir. 2021) (citing *Reno v. Flores*, 507 U.S. 292, 306 (1993)). Thus, "[i]neffective assistance of counsel may violate a petitioner's right to due process where counsel's deficiencies render 'the proceeding . . . so fundamentally unfair that the [noncitizen] [is] prevented from reasonably presenting his case.'" *Muyubisnay-Cungachi v. Holder*, 734 F.3d 66, 72 (1st Cir. 2013) (quoting *Bernal-Vallejo v. I.N.S.*, 195 F.3d 56, 63 (1st Cir. 1999)). "A petitioner bringing an ineffective assistance claim must establish both a deficient performance by counsel and 'a reasonable probability of prejudice resulting from [his] former representation.'" *Id.* (quoting *Zeru v. Gonzales,* 503 F.3d 59, 72 (1st Cir. 2007)).

Turning now to the second bond hearing, IJ Olson found that Mr. Higiro was not a suitable candidate for any alternative to detention program, and she also reaffirmed IJ Smith's dangerousness determination and denied Mr. Higiro's second request for release on bond. *Higiro II*, 2026 WL 1329522, at *5-7. "[I]n making her

dangerousness determination, the IJ gave considerable weight to Mr. Higiro's criminal history, observing that he 'has had three encounters with police since 2023: one conviction for disorderly conduct, an OUI charge, and pending criminal investigation for assault, criminal restraint, and furnishing a place for minors to consume alcohol.'" *Id.* at 6. The IJ largely relied on police reports and other evidence in the record, such as an interview with the alleged assault victim, photographs, and video footage, to corroborate the allegations made against Mr. Higiro. *Id.*

In his latest habeas petition, Mr. Higiro faults his Attorney for coming to his bond hearing "unprepared to rebut the corroboration on which the government relied" and for "offer[ing] no evidence responding to the police reports the IJ found corroborated." ECF No. 1 at 22. Mr. Higiro claims that his Attorney could have but failed to introduce certain documents establishing that his three police encounters did not result in criminal convictions, and that he "raised his hand seeking to present that responsive material himself," but nevertheless "the ruling proceeded, and the material was never placed before the IJ." *Id.*

After a careful reexamination of the record, the Court simply cannot conclude that his Attorney's performance was so deficient as to render the bond hearing "fundamentally unfair." *See Muyubisnay-Cungachi v*, 734 F.3d at 72; *Bernal-Vallejo*, 195 F.3d at 63. First, contrary to Mr. Higiro's argument, his Attorney *did* produce the material that he now claims was missing from the bond record. The Court knows this because, in response to an earlier order directing the Government "to produce . . . any exhibit, including a hearing transcript, digital audio recording, and/or bond

order" from Mr. Higiro's second bond hearing, *see* Text Order, *Higiro v. Nessinger*, No. 26-cv-105-JJM-AEM (Mar. 27, 2026), the Government produced the evidence that his Attorney filed with IJ Olson before the start of the proceeding. ECF No. 13, *Higiro v. Nessinger*, No. 26-cv-105-JJM-AEM (Apr. 2, 2026).

Moreover, at the beginning of the bond hearing, IJ Olson expressly acknowledged this filing and marked it as an exhibit, along with the exhibits submitted by the Department of Homeland Security ("DHS"):

> **IJ:** Alright, we're here for a bond proceeding. Court's familiarized itself with the record after receiving this matter. I see we have a District Court Order from the District of Rhode Island in this case. Just a moment. That order indicates the Government is hereby ordered to provide Mr. Higiro with a bond hearing under 1226(a) within 10 days, during which the Government must show that alternatives to detention to ensure the safety of the community would be inadequate. The Court is ordering that alternatives to detention be considered. The judge shall meaningfully consider alternatives to detention before making any determination as to flight risk or dangerousness. Alright, Government shall file a status report. Alright, so we will be holding a bond hearing pursuant to that District Court Order. That will be Exhibit 1. 2 will be evidence filed by DHS on 3/18/26. 3 will be also evidence filed by DHS on the same date. And then second separate filing. And 4 will be evidence filed by [Mr. Higiro] today. Has the Court missed any exhibits? Any objections? [DHS]?
>
> **DHS:** No, your honor.
>
> **IJ:** Counsel?
>
> **CF:** No, your honor.
>
> **IJ:** Alright, Exhibits 1-4 are admitted.

Bond Hearing, at 01:44-03:20, Chelmsford Immigr. Ct. (recorded Mar. 19, 2026) (hereinafter "Bond Hearing").[6]

[6] Pursuant to this Court's earlier text order, the Government submitted an audio recording of the bond hearing. *See* ECF No. 13, *Higiro v. Nessinger*, No. 26-cv-

It is true that, at times, his Attorney struggled to identify the specific location of evidence contained within his exhibit, such as evidence that Mr. Higiro's OUI charge had been dismissed:

> **CF:** So, this was an OUI charge. It was dismissed later last year. The reason why was because, essentially, a lack of evidence, essentially, pertaining to the OUI itself.
>
> **IJ:** Alright, do I have that in the current record, that it was dismissed for lack of evidence? Where is that in the record?
>
> **CF:** I think specifically . . . it would be under Exhibit 4, excuse me, F, from the Gorham Police Department.
>
> **IJ:** Sorry, which exhibit that the court's marked? There are 4 exhibits.
>
> **CF:** Exhibit 4. Within Exhibit 4, Exhibit F of that.
>
> **IJ:** Alright, and it specifically indicates lack of evidence? Or is that your interpretation, Counsel?
>
> **CF:** No, that . . . I mean it doesn't . . . I'm trying to find exactly where it says, specifically, that. But I do know that that is in fact the case.
>
> **IJ:** Alright, what I'm wondering is how do you know that? Is that in the record?
>
> **CF:** It is in the record. It's in one of these documents. I apologize.

Bond Hearing, at 17:38-19:09.

Even so, Mr. Higiro raised his hand at the bond hearing, and IJ Olson gave him the opportunity to clarify that the OUI charge, as well as the other two charges against him, had since been dismissed.

> **IJ:** Alright, sir. What is it you're raising your hand for, sir?
>
> **Mr. Higiro:** Your honor, if you would allow me to add to what Counsel is trying to do here because it's painful for me to see that he is not finding

---

105-JJM-AEM (Apr. 2, 2026). The Court has listened to the bond hearing in its entirety and quotes relevant portions of it throughout this Order.

> things when I have them here, and they have been submitted. So, if I may take a minute to, sort of, supplement him. If that's ok.
>
> **IJ:** Counsel for [Mr. Higiro], do you have any concern with that?
>
> **CF:** I have no concerns with that.
>
> **IJ:** Alright, sir, go ahead very briefly.
>
> **Mr. Higiro:** So, your honor, I'll just say that, since Judge Smith's decision, there has been material change in circumstances, and there were three pending cases, actually two pending cases, at the time, in March, last year. One was the OUI charge. The docket number is Cumberland-cr-23-1405, and that one was dismissed because there was no evidence for criminal conduct. And then, the one that counsel is referring to in Brunswick is related to the summons number 3479335 and 3479336 and 3479337. I have a letter from the Cumberland County Attorney's office. It says, "This letter is to notify you that the Cumberland County District Attorney's office is not proceeding with criminal prosecutions" of the charges in connection with the summons that I just read, so this letter from the DA's office was submitted to the District Court. They have it. And then the third one, your honor, was the disorderly conduct from New Hampshire, which is a violation. That one was recently annulled. So, like I said, at the time when Judge Smith made her decision, all of these things were still pending, and they have been resolved in my favor since then. And I was privileged to read the district judge's decision. He basically said that in this bond hearing, alternatives to detention should be considered, given that there has been a change in circumstances, and in my opinion, the argument that I am a danger to the community doesn't stand right now, given that I have no, literally no conviction at all, and everything has been dismissed. That's all what I wanted to say, your honor.
>
> **IJ:** Alright, thank you sir.

Bond Hearing, at 19:14-22:29.

As the record makes clear, Mr. Higiro himself acknowledged that his Attorney "submitted" the very documents he now claims were never presented to IJ Olson. And even if his Attorney had incomplete knowledge of his client's criminal history, IJ Olson gave Mr. Higiro the chance to speak further on the matter and clarify that no charges were pending against him. IJ Olson nevertheless denied Mr. Higiro's request

for bond, but that denial cannot be directly attributed to his Attorney's performance. *See, e.g.*, *Alexander-Mendoza v. Att'y Gen. U.S.*, 55 F.4th 197, 211 (3d Cir. 2022) (finding that the record did not compel conclusion that a noncitizen's attorney's performance at his bond hearing caused the IJ to deny bond where, even though the attorney had incomplete knowledge of the noncitizen's criminal history, the IJ questioned the noncitizen directly on his criminal history and denied bond anyway).

What is more, as the Court previously observed, "[t]he IJ acknowledged that 'there has been a significant change in circumstances in that charges were dismissed or annulled or essentially are no longer pending, and that [Mr. Higiro] has no longer any pending charges.'" *Higiro II*, 2026 WL 1329522, at *6 (quoting Bond Hearing, at 45:13-45:29). "Nevertheless, the IJ reasoned that, 'despite the fact that the charges were no longer being pursued, the court here is still able to consider the underlying facts and evidence, including any police reports and evidence," and that she found this information to be "reliable and corroborated[.]"' *Id.* (quoting Bond Hearing, at 45:38-46:01). That is to say, the factual circumstances surrounding Mr. Higiro's arrests were concerning enough on their own to warrant a dangerousness determination. Evidence that Mr. Higiro's arrests produced no criminal convictions (which, again, his Attorney did in fact produce), would not have changed this outcome.

Mr. Higiro also faults his Attorney for failing to correct a factual discrepancy allegedly made by DHS during his first bond hearing. ECF No. 1 at 20-21. According to Mr. Higiro, DHS represented that, during his arrest for assault, criminal restraint, and furnishing a place for minors to consume alcohol, he had thrown the alleged

assault victim on the ground and kicked her. *Id.* at 20. Mr. Higiro vehemently denies this allegation, and he claims that IJ Olson relied on the allegation in making her dangerousness determination—a result that he claims is his Attorney's fault. *Id.*

The Court is unconvinced. First, the Court agrees with the Government that Mr. Higiro produced no evidence to show that IJ Olson was even aware of this alleged factual discrepancy, let alone that it influenced her decision-making. ECF No. 4 at 6. Indeed, the IJ stated at the bond hearing that her dangerousness determination was based on "'a concerning and escalating pattern of [Mr. Higiro] engaging in dangerous and violent actions to others.'" *Higiro II*, 2026 WL 1329522, at *6 (quoting Bond Hearing, at 47:49-48:04). "The IJ also emphasized 'the recency and number of encounters with police since 2023, involving very serious potential actions that clearly relate to danger to the community.'" *Id.* (quoting Bond Hearing, at 48:06-48:30). Thus, even if his Attorney did fail to correct this factual discrepancy, this is not outcome-determinative because the IJ's bond determination was based, not on a single isolated incident, but on a pattern of conduct spanning multiple arrests. The Court therefore cannot say that this alleged oversight resulted in prejudice to Mr. Higiro.

Accordingly, the Court DENIES Mr. Higiro's ineffective assistance claim.

### C. Inadequate Medical and Psychiatric Care Claim

Finally, Mr. Higiro alleges that he has been receiving inadequate medical and psychiatric care while detained at the Wyatt in violation of his due process rights. ECF No. 1 at 23-25. Specifically, he asserts that personnel at the Wyatt have not

been adequately treating his pre-existing mental health conditions (i.e., post-traumatic stress disorder ("PTSD"), major depressive disorder, and panic disorder) or his chronic pain in his left knee. *Id.*

As a primer, the Constitution imposes upon the Government a duty to assume responsibility for a detainee's safety and general well-being while in custody. *See Helling v. McKinney*, 509 U.S. 25, 32 (1993); *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989). In the pretrial detainee context, due process requires the Government "to refrain at least from treating [the] detainee with deliberate indifference to a substantial risk of serious harm to health." *Coscia v. Town of Pembroke*, 659 F.3d 37, 39 (1st Cir. 2011) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)); *see also Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). And "[c]ourts generally apply the same standard for civil immigration detainees as for pre-trial detainees." *Savino v. Souza*, 453 F. Supp. 3d 441, 451 (D. Mass. 2020) (citing *E. D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019)).

The Court now returns to the claims at issue here. First, as to his mental health care claim, Mr. Higiro acknowledges that Wyatt personnel have prescribed him medications for his conditions and have made psychotherapy available to him. ECF No. 1 at 24; ECF No. 8 at 13. The Government, for its part, has submitted medical records showing that Mr. Higiro "has consistently failed to take [his] prescribed medications," and that "he's repeatedly declined" psychotherapy while at the Wyatt. ECF No. 4 at 8; *see also* ECF No. 6 at 4-8.

Second, as to his chronic knee pain claim, Mr. Higiro submits that his medically prescribed knee brace was confiscated from him when he was first detained, and he seems to suggest that, after he reinjured his knee on December 3, 2025, he has been blocked from getting knee surgery. ECF No. 1 at 24-25. The Government counters, arguing that security personnel confiscated his original knee brace because it contained metal, and that he was later provided with a soft brace that he wore for 9 months before he reinjured his knee. ECF No. 4 at 11. Following his reinjury, Mr. Higiro saw a physician who recommended that he receive a steroid injection to reduce inflammation and pain in his left knee and that he continue his physical therapy exercises at the Wyatt and continue wearing his brace as needed. ECF No. 1-7 at 3. The Government submits that Mr. Higiro has received all three of these treatments, and points out that, contrary to Mr. Higiro's portrayal, his physician never recommended knee surgery. ECF No. 4 at 10-11. As a result, the Government contends that there are no "constitutional shortcomings in the treatment provided." *Id.* at 12.

The Court agrees. Once again, the standard that Wyatt personnel are held to is "deliberate indifference," and this standard "requires a showing of greater culpability than negligence but less than a purpose to do harm . . ., and it may consist of showing a conscious failure to provide medical services where they would be reasonably appropriate." *Coscia*, 659 F.3d at 39 (first citing *Farmer*, 511 U.S. at 835; then citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "To show such a state of mind, the [petitioner] must provide evidence that the [Government] had actual knowledge

of impending harm, easily preventable, and yet failed to take the steps that would have easily prevented that harm." *Leite v. Bergeron*, 911 F.3d 47, 52-53 (1st Cir. 2018) (quoting *Zingg v. Groblewski*, 907 F.3d 630, 635 (1st Cir. 2018)).

Though his conditions of confinement may not be ideal, it cannot be said that Wyatt personnel have been deliberately indifferent to Mr. Higiro's medical and psychiatric needs. Rather, the evidence shows that the staff have consistently provided him with access to appropriate prescription medications, psychotherapy sessions, and orthopedic care. Mr. Higiro has nevertheless declined to engage in these various forms of treatment. This does not suffice to establish a constitutional violation.

Thus, the Court also DENIES Mr. Higiro's inadequate medical and psychiatric care claim.

## IV. CONCLUSION

For the reasons stated, the Court DENIES Mr. Higiro's Second Habeas Petition. ECF No. 1. If he remains detained beyond the presumptively reasonable six-month detention period contemplated by the *Zadvydas* Court, Mr. Higiro may file a new habeas petition reasserting his unreasonably prolonged detention claim.

IT IS SO ORDERED.

***/s/ John J. McConnell Jr.***

JOHN J. MCCONNELL, JR.
Chief Judge
United States District Court

September 8, 2026